Good morning. May it please the Court, I am Fritz Klapp, representing Appellants David Burgess and Ingrid Burgess, and I request to reserve two minutes for rebuttal. All right. Watch the clock. The issues in this case are whether the District Court erred in finding the Mustang Ranch trademarks for brothel services was not abandoned by the federal government, and whether the District Court erred in finding the auction sale of the mark was not an assignment in gross. Appellants urge reversal on both of these issues. The District Court's finding that the mark had not been abandoned is clearly erroneous. It is undisputed that the Mustang Ranch mark was not used in connection with licensed brothel services from the government's seizure and closure of the business in July 1999 until the purported sale in late 2003. The assertion that the government's intent was uncertain has absolutely no evidentiary basis and is merely conjecture. All the circumstantial evidence of the government's disposition of the seized assets is consistent with an intent that the mark never again be used in connection with brothel services. And so during the relevant time period, didn't, in fact, the government, the Bureau of Land Management, send out cease and desist letters to people who were using the mark? The BLM's letters in that regard came after the transfer from the Bureau of Land Management Department of Justice to Department of Interior fully three and a half years after the initial seizure. The letters to which you would be referring occurred only after it came to the government's intention that Burgess had begun use of the mark, believing it had, believing properly, we feel, it had been abandoned. Mr. Clapp, are you suggesting that the abandonment occurred and we shouldn't look past the date when the transfer to the Bureau of Land Management took place, that it was already over and done with before that transfer? We would argue that fully three and a half years of non-use coupled with an intent not to use established abandonment prior to the transfer to the Department of Interior. Because I think that you relied in your briefs in part upon a public statement by the Bureau of Land Management with respect to their intention to demolish the buildings. Indeed. It was, this is additive. We argue first that the government's intent to abandon was unequivocal for three and a half years and that after the transfer of the property and structures to the Interior Department, BLM then issued a press release on March 10th of 2003 that it had, quote, made a decision to demolish the two closed Mustang Ranch brothels. Other than the passage of time, what supported a showing of intent to abandon the buildings prior to the transfer to the Bureau of Land Management? The fact that the government had done nothing to preserve the assets or to keep them intact. In fact, the behavior of the Department of Justice in auctioning off the personal property in 2002 was that it be sold in individual lots so that the business could not possibly be reassembled and resumed. So there were affirmative acts of the government in the Department of Justice which were antithetical to the resumption of the business. Mr. Clapp, there was personal property that was sold off, but the buildings were not sold until later on. Isn't that so? The structures remained on the property as part of the realty. And they were sold later. Indeed. After they were slated for destruction, as pointed out in the press release, then BLM discovered that there was an issue regarding the trademark and frankly, I think this was the first time that anyone in the government considered the trademark issue. But at that time, the mark had already been abandoned by the federal government. But not by the sale, the personal things. You say, well, once they had sold some of the personal property and one item I think was a bathtub, wasn't it, or something? They were all, I mean, they even, they sold the sheets from the business. They sold everything. Well, you couldn't then resume the activities of the Mustang Ranch because all the personal property apparently had been sold. I think that was your argument, wasn't it? Well, everything that was associated with the business that identified it as Mustang Ranch and which would have carried the mark had been dispersed. The only thing that remained when the transfer was made to BLM were the toxic laden shells of buildings. And it was an invention on the part of BLM, a clever one I will say, to hypothesize that the goodwill of the business was embodied in those structures. This was a bootstrapping argument, which was attractive to the buyer. Mr. Gilman didn't so much buy a trademark as he bought a lawsuit. After the unequivocal abandonment, which was what I think the point, and perhaps this was part of what Judge Bolton was getting to, that there was a sale of personal property, but there was nothing else that indicated any abandonment of the trademark, as far as I can see. You're saying, well, we can imply that because they sold off the personal property. I think that's your argument. Well, but the law of abandonment results from non-use together with an intent not to resume use, the electrosource case. And the intent not to resume may be inferred from circumstances. Well, all of the circumstances for over three years was to ignore, and for that matter to, well, there was an offer made by a former government employee to purchase the mark. And that offer was, not even a response was made to that. There was an opportunity to buy it. But as I say, that inquiry was ignored. We infer from that that the government intended not to resume the business. But couldn't the trial judge draw a different inference? I mean, the problem with drawing the inference is that there may be more than one reasonable inference to draw. And the trial judge, after hearing the evidence, drew a different inference than the one you suggest. It wasn't so much an inference as conjecture. There was nothing in the record to suggest that the government had any uncertainty about intent to resume or that the government entertained the possibility of resuming. But was there anything in the record that they didn't intend to resume? I mean, that's the problem. Yes, there was the unequivocal intent stated by the press release that the buildings would be destroyed. Which was quickly followed up by a different course of action. It was. And case law says that once you have made such an unequivocal affirmative act of abandonment, voluntary abandonment, that a mark cannot be revived. Well, that gets to your point of the allegation that it was a transfer engrossed because there's still the argument that is being made that apparently the trial judge never had to reach because of his decision with respect to the buildings. That even without the buildings, this was not a transfer of the mark engrossment and was a legitimate transfer of the trademark and the goodwill that went along with the claim for brothel businesses. Indeed. The trial court indulged the government by hypothesizing a tolling and an excuse, neither of which had any support in the record but was merely conjecture. Indeed, by the method, by the logic used by the district court to validate the transfer, it worked backwards in time to explain the tolling and the nonuse in order to avoid the abandonment argument. But wasn't there clearly a tolling for at least two years when there was a stay in effect of the forfeiture? No. The government could have operated the business. The government could have transferred the business prior to that time. In fact, there was a precedent for doing so. Ten years earlier when the IRS seized the business, it did operate immediately. So it could have operated the business. It could have sold the business. But there was such a program attached to this and it was such a grudge match between the federal government and the Confortes over decades that it was considered a moral victory that this brothel had been closed and that it would never reopen. Is there evidence in the record of that? Yes, there is. In fact the brothel would close and never be reopened, not the aspect of there being many years of litigation between the government and the Confortes. There was no express statement that it would never be reopened. I reserve the balance of my time. Thank you. All right. Thank you, Counsel. Good morning. Mark Gunderson appearing on behalf of Lance Gilman and others. May it please the Court. This is one of the most unique cases that I believe ever came before Judge Reed. And on a number of occasions Judge Reed observed that this was a very unique case with fascinating and unusual facts. That was a very correct statement of what this case is about. There's no question of what the law is and there's no question what the facts are. The real question is did Judge Reed appropriately apply the law to the facts that he found to be unusual and fascinating in this very unusual case? And the only conclusion that can be drawn logically from the evidence that Judge Reed received is yes. This is not a case where the Court was not fully engaged with the receipt of the evidence, the progress of the evidence coming in, and staying fully on top of this case. The decisions of Judge Reed entering his order show that this Court took all of the facts into consideration in a very considered and deliberate process and properly applied those facts to the law. The real crux of this case is, as you have observed, is there sufficient evidence in the record for the conclusions of fact reached by Judge Reed? And the answer is clearly and resoundingly yes. There are conflicting facts that were presented and Mr. Clapp has recited some of those conflicting facts. This judge did what courts are required to do and that is decide which set of facts are the proper set of facts to be applied to the law because the law of abandonment is an issue of fact. That determination by Judge Reed cannot be overturned because Mr. Clapp or Mr. Burgess would like it to be otherwise. There has to be clearly erroneous conclusions reached by Judge Reed that this Court can take a look at and examine. There are no such facts. In order to have abandonment, it is clear there has to be non-use and an intent not to resume use. Judge Reed heard from a number of witnesses on this point on the case. One of them was Mr. D. Alf Brandt, who was a substantial witness for the government at the time of the trial. And Mr. Brandt said quite clearly when the government acquired the assets of the Mustang Ranch, it didn't know what it had or what to do with it or where they would go. I have two questions I have. Okay. So replete in this decision is the government didn't know what it had. The government clearly wasn't going to operate this brothel itself. The government was indecisive because it's a multifaceted bureaucracy. And the result of all that is the district court judge saying, so we're going to excuse the government for all of this behavior and find that it doesn't amount to an abandonment. Wasn't he being a bit indulgent of the government's inability to act or understand the value of the rights that it had at the time? I mean, it did seem that during the period when Brandt didn't know that they had any value in this mark that, I don't know if you could say he intended to abandon it, but I also don't know whether you could say he intended to resume use of it because he had no idea what the value of it was. This is the problem you run into when you have a unique case with unique facts. This is not something the government is used to dealing with. You have to put this into context. How did the government come into control of this property? It came into control of this property through a seizure to pay an IRS lien. It brought this property on board. This isn't the kind of property that you would go list with an appraisal house or with an auction house and try to sell this as you would in a warehousing business or a manufacturing business. This is a unique trademark in a unique industry that has very few buyers. That's right, but when it was forfeited, the government had to put a value on the forfeited asset, right? There's no evidence that it ever put any value on these assets. What it did, and this is the evidence that's in the record, it seized everything the Confortis had. There were probably half a dozen pieces of real property. There were all sorts of personal property that were out there. This was just one of all of the assets that the IRS seized. There's no evidence that the IRS ever undertook to value anything other than the real property and the personal property, which it then auctioned off, and that's exactly what they did in this case. My point is that the government does what the government should do when it's trying to maximize its return to the taxpayers, and that is determine what did it seize, what is the value of what it is that they seized, and what did they do with it? As Judge Reed noted, the government needed to go through a deliberative process, and that's exactly what it did. It went from one administrative agency of the government to another administrative agency of the government, and they were trying to decide what are they going to do with it and where are they going to maximize the rate of return to the government. That's what they did. The government should not be penalized for going through the deliberative process that they're required to go through to maximize the return to the taxpayers, because it's intended to abandon something it didn't know it even had. Right. It's interesting you call it a deliberative process, but Judge Reed called it indecisiveness. I guess it's your perspective. There's evidence in the record where Alf Brandt refers to it as the deliberative process. Judge Reed believes that's indecisiveness on the part of the government. I think whatever label you put it, they had to take some time to think it through and decide what they wanted to do. Does that mean that's the requisite intent to abandon it and not to resume use? Of course it doesn't. In fact, what it does show is the government, as it went through this process, when it went to the BLM, the BLM did what it was supposed to do, inventory its assets, determine what it has, maximize the rate of return to the government, and that's exactly what it did. Clearly, the government did not fully understand the rather complex areas of the law of trademarks and the protection of trademarks. That's something it appears to have learned through the process. When the government realized, and by the way, the correct period is from 2001 to 2003. Both Judge Reed and Judge Hagan found that there was excused non-use from 1999 to 2001. There's ample support in the record for that conclusion. We don't have a three-year presumption. But the court found then in this period that Burgess failed to show by clear and convincing evidence of lack of intent to resume use. That's the requirement that Burgess had to reach. Burgess did not show by clear and convincing evidence intent not to resume use. Is at best conflicting evidence. Judge Reed found, and properly so, there was no clear and convincing evidence of intent not to resume use. In fact, as you've noted, in that 2001 to 2003 period, the government did say, it's our mark, don't use it, and it went out to a number of people and said they wanted to protect that mark. The government appears in that 2001 to 2003 time frame to take an actually very strong position to the contrary that it does. Not itself to intend to resume use because quite frankly, the 1990 time period when the government ran the brothel was a complete public relations nightmare as well as a financial disaster for the government, which, by the way, was in a bankruptcy context. So that's not really very applicable. It was absolutely clear the government didn't intend to run a brothel, and that's probably the correct decision. I don't think the government was indecisive in that decision. But the question then becomes is what is it selling? And I think it's instructive because this is the kind of evidence that's in the record, and it is replete. This is the sale of the Mustang Ranch Brothel Circular, which is in Mr. Claff's excerpts of record starting at page 57. The Bureau of Land Management is selling the Mustang Ranch buildings and the rights to the business and the remaining goodwill of the world-famous Mustang Ranch trademark so closely connected to this world-famous pink structure. What's interesting about that, and there is evidence in the record both from Mr. Gilman and Mr. Brandt, that the uniqueness of this business was connected to the buildings. And I would disagree with the fact that it doesn't involve sheets and matchbook covers and those kinds of things. The essence of this mark is the rendition of prostitution services in connection with the trademark. So it's not a transfer in gross. In any event, it was connected very closely to the goodwill associated to the buildings, and Judge Reed properly found that those the confluence of those facts indicated that there was goodwill that went with the structures as well as the inherent association of the services with the mark. There cannot be a retrial or a re-guessing or a re-examination of Judge Reed's well-reasoned decision. Judge Reed went through the evidence and the law and properly applied the facts of the law and made the correct factual determinations in a very complex, unusual case. And I believe that this Court should not try to second-guess Judge Reed, but in fact find that in fact his decision was proper, correct on the facts, correct on the law. There has been no abandonment. There never was an abandonment. The government never took any steps to evidence abandonment, coupled with the fact no transfer in gross. Thank you. Just two points in rebuttal, Your Honors. With regard to the assertion that the goodwill of the brothel business was embodied in the only tangible assets remaining in BLM's hands, the toxic-laden building shells which had been slated for destruction, the only advocates of this interpretation are the two parties to the transaction, and their self-serving opinions were offered at trial. However, there is no basis for these assertions in any prior documents. No competent expert testimony was offered. And we would posit that these – that this assertion was completely self-serving and not credible. And finally, Your Honors, I correctly note that while Judge Reed described government indecision or indecisiveness, this is also described elsewhere as waiting for a deliberative process to unfold. Either of these are found only by speculation and by conjecture. The only government witness, Alf Brandt, a department – or a BLM employee, was the only government witness who had no personal knowledge and could offer no testimony regarding what the government was or was not doing prior to the transfer to Interior. And so the record was silent, actually, as to whether it was indecisiveness, deliberative, or, in fact, a unstated intent not to resume. We submit the matter. Thank you. All right. Thank you, counsel. Burgess v. Gilman will be submitted. We will turn to Turnicliffe v. Wesley. Marianne?
judges: Thompson, Wardlaw, Bolton